# Palcsey v. Palcsey

C.P. of Allegheny County, no. FD 95-8366-004.

*John M. Smith,* for plaintiff.
*Jeffrey S. Weiss,* for defendant.

SCANLON, *J.,* June 19, 2000—Theresa Palcsey, appellant (Mother), appeals this court's December 29, 1999, order granting Mark Palcsey, appellee (Father), unsupervised partial custody of his younger son, Philip, subject to a certain condition imposed in the order.

The order of December 29, 1999, sets forth an exhaustive history of the custody litigation between these parties. Some portion of that history is worth reciting herein.

The parties hereto were married on May 8, 1982, separated in early 1995, and were divorced June 23, 1997. The parties have two children, Matthew (dob July 19, 1987) and Philip (dob October 18, 1991). Shortly after separation, a custody consent agreement was executed which was then incorporated into an order of court dated April 13, 1995. This agreement gave primary physical and legal custody of the boys to Mother, while Father was granted partial visitation rights with the minors only under the supervision of the Mother or maternal grandparents, Veronica and Albert Santillo, according to a schedule to be worked out between the parties. Father was unrepresented by counsel at the time the agreement was negotiated and executed. The provisions for supervised visitation were incorporated into the agreement

because Mother alleged that Father had sexually abused the oldest son, Matthew. The initial report of sexual abuse was apparently made to a physician in February 1995, and was then brought to Allegheny County Children and Youth Services on March 21, 1995. An agency determination of "indicated" was communicated on June 9, 1995, even though Father had been advised by correspondence on May 23, 1995, that the case had been closed. A criminal prosecution followed and after preliminary hearing, formal arraignment, and the scheduled commencement of trial, the charges against Father were withdrawn.

The two pending petitions before this court were Father's September 16, 1996 petition for modification of custody order seeking primary physical custody of both children, and Father's petition for modification of custody order seeking unsupervised partial custody of both boys.

Following two days of testimony, this court denied Father's request for primary physical custody of both children; denied Father's request for unsupervised partial custody of Matthew; terminated the supervised visitation order; and granted Father unsupervised partial custody of the younger son, Philip.

Mother first complains on appeal that this court erred in allowing Father's expert witness, Dr. Richard Gardner, to testify in violation of *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923).

While this court permitted Dr. Richard Gardner to testify, he was found to be biased, not credible, and his opinions and testimony were completely disregarded by this court in opinion and order of December 29, 1999. Accordingly, there would not appear to be any

further need to respond to this first complaint of Mother.

Mother next complains that this court erred in not releasing the medical and psychiatric evaluations of Father performed at St. Francis Hospital after Father committed himself there in February 1995. It is further asserted that it was error to not consider these evaluations in the court's final decision.

It should be noted that counsel for Mother presented a motion to obtain records in motions court on July 30, 1998, requesting that the records of St. Francis Mental Health Facility of Father's February 1995 admission, be released to the court. While this motion was denied as presented on July 30, 1998, we noted on the order that this issue would be resolved at a subsequent conciliation. Indeed, a custody conciliation was held on August 27, 1998, and in a consent order signed by the parties and counsel that day, Father was directed to execute an authorization for release of the St. Francis Hospital records to be turned over to this court for an in camera review. Those records were subsequently furnished to this court, but neither litigant ever brought the subject up again. The records were not identified in the pre-trial statement filed on behalf of Mother. Further, they were neither referred to at trial nor was there any effort to seek their admission into evidence.

Mother next complains that this court erred in barring its own court-appointed expert, Robert Tedder, L.S.W., from testifying about the diagnostic evaluations he made in his evaluations of Mother, Father, and Matthew.

The parties were ordered in December 1996 to participate in family therapy with Mr. Robert Tedder, a pas-

toral therapist with a master's in social work. Accordingly, he would hardly be considered a court-appointed expert. Moreover, the testimony sought by Mother to be elicited from Mr. Tedder, involved the diagnosis of Matthew's psychological and medical condition. (Tr. at pp.183-86.)[1] We excluded this testimony on the basis of the lack of competency of a social worker to render medical and/or psychological opinions and, further, because Matthew's condition had already been described at trial by psychologists and/or psychiatrists.

The law regarding the qualifications of witnesses as experts is well established. Whether a witness has been properly qualified to give expert opinion testimony, is vested in the discretion of the trial court. *Abbott v. Steel City Piping Co.,* 437 Pa. 412, 421, 263 A.2d 881, 885 (1970). Moreover, the Pennsylvania standard of qualification for an expert witness is a liberal one, and if a witness has any reasonable pretension to specialized knowledge on this subject under investigation, he/she may testify, and the weight to be given to the testimony is for the fact-finder. *Kuisis v. Baldwin-Lima-Hamilton Corp.,* 457 Pa. 321, 338, 319 A.2d 914, 924 (1974). We are to determine if the witness has "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his[/her] opinion or inference will probably aid the trier in his search for truth." *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 36, 485 A.2d 408, 415 (1984).

Mr. Tedder, as a licensed social worker, has no reasonable pretension to specialized knowledge to be tes-

---

1. References to the pages of the transcript of the October 26, 1999 hearing are referred to as "Tr. at ___."

tifying with regard to psychological and/or psychiatric diagnoses. Accordingly, it was proper to preclude him from so testifying.

Moreover, the court had heard from two psychologists and two psychiatrists as witnesses on behalf of Mother with regard to these issues.

The substance of the next three complaints by Mother are that this court refused to decide a factual question as to whether or not Matthew had been sexually abused by Father, and yet allowed Father to have partial custody of the younger brother, Philip, under a best interest of the child standard.

It is axiomatic that the paramount concern in a child custody proceeding is the best interest of the child. *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992). In dealing with visitation rights or partial custody cases, however, the more restrictive "grave threat" standard has long been applied. *Scott v. Scott,* 240 Pa. Super. 65, 368 A.2d 288 (1976); *Scarlett v. Scarlett,* 257 Pa. Super. 468, 390 A.2d 1331 (1978).

Visitation has been granted parents who have ignored their children for a long period of time, *Commonwealth ex rel. Turner v. Strange,* 179 Pa. Super. 83, 115 A.2d 885 (1955); who have failed to support their children, *Scott v. Scott,* 240 Pa. Super. 65, 368 A.2d 288 (1976); who have engaged in marital misconduct or have lived with lovers, *Commonwealth ex rel. Sorace v. Sorace,* 236 Pa. Super. 42, 344 A.2d 553 (1975); to parents whose children did not want to see them, *Fernald v. Fernald,* 224 Pa. Super. 93, 302 A.2d 470 (1973). Further, even in cases when the trial court found that sexual abuse had occurred between a parent and a child, that court still found that it was in the best interests of the

child to continue to have contact with the parent, but under supervised visitation limitations and these findings were upheld by the appellate court. See *S.H. v. B.L.H.,* 392 Pa. Super. 137, 572 A.2d 730 (1990).

The court declined to make a finding one way or the other with regard to the alleged sexual abuse, as it did not appear to be necessary. Matthew was born on July 15, 1987; so by the time he testified in court he was 12 years old. Even if the allegations of sexual abuse were true, the time period during which they allegedly occurred was approximately the summer of 1994 to perhaps early 1995. (See respondent exhibit 10, testimony before District Justice Mary Ann Cercone of August 1, 1995.) Thus, the alleged events had occurred more than four and one-half years prior to trial.

As we wrote the decision in December 1999, the supervised visitation status had been in place for almost five years. The critical area of inquiry involved the best interests of Matthew and Philip for the future, and whether or not Father posed a grave threat to them. We found that Matthew was clearly suffering from anxiety and depression, based not only upon the opinions of the medical and psychological witnesses who testified on behalf of Mother, but also the court's own observations of Matthew in chambers. The court further found, based again upon the collective judgment of all of Mother's witnesses, that ongoing contact, supervised or not, was contra-indicated with regard to the mental, emotional, and physical condition of Matthew. This obviated any need to find whether or not any sexual abuse had actually occurred.

With regard to the younger son, Philip, we had no evidence of inappropriate contact between Father and

him, nor did we have any evidence to suggest that Philip was suffering from any physical or emotional type problems. To the contrary, the only evidence was that Philip and his Father interact well, play happily, and that Philip has a positive experience during the visits. Further, Father has remarried and has a stepson, Derrick, who is the same age as Philip. Father's new wife, Melanie Palcsey, presented very credible testimony concerning the relationship between her son and Father, and her own observations of Father during the two years of their marriage. She indicated that her son had a very positive relationship with Father. She described how the two of them play games, and that Father bathes her son, gives him a snack, says prayers with him, and reads books nightly before bed. It was obvious from her testimony, and given the level of contact her son has with Father, that she has absolutely no reservation about her husband nor his interaction with her son. She further testified that her son and Philip have been together on occasion and that the visits and their interaction was great. She further presented emotional testimony that she has observed her husband over the last two years, praying nightly for the return of a relationship with his sons, and that he has often cried in her arms about this situation. She testified that he has worked several jobs and she changed her employment in order to help support the household so that this battle for custody could continue. We found her testimony to be very credible in all of these regards.

Further, because of the nature of the supervised visitation between Philip and his Father, two hours every other weekend for almost five years, we believed it was in Philip's best interests to ease him into a more sig-

nificant relationship with his father. Accordingly, the court ordered that Father, Mother, and Philip be referred to the parent and child guidance center program of "families in transition" for counseling, including three separate sessions between Father and Philip. The court further directed that unsupervised visitation commence only after completion of the five counseling sessions, and that for eight weeks, the unsupervised visitation be limited to four hours duration and always in the presence of Father's new wife, Melanie Palcsey. Thereafter, for a period of four weeks, the court provided for unsupervised visitation on Sundays for eight hours in duration. The court then provided for partial custody every other weekend, and one off-week visitation on Wednesdays, summer custody, holidays, etc.

In child custody proceedings, it has been established in Pennsylvania that "[e]very parent has the right to develop a good relationship with the child, and every child has the right to develop a good relationship with both parents." *In re Constance W.,* 351 Pa. Super. 393, 398, 506 A.2d 405, 408 (1986). A parent "should seldom be denied" visitation with a child. *Costello v. Costello,* 446 Pa. Super. 371, 376, 666 A.2d 1096, 1099 (1995). There being no finding that Father suffers from severe mental or moral deficiencies that constitute a grave threat to Philip, he should not be denied visitation with him. Father had quite a restrictive form of visitation with Philip for almost five years. It was time for Philip to have an opportunity to create a relationship with his father.

Mother next complains that this court erred in allowing Melanie Palcsey, Father's current wife, to serve as a supervisor during the initial visits between Father and Philip because she had no training or experience in the

field of child sexual abuse, child development, or visitation supervising, and because she is biased.

While we did not specifically "label" Melanie Palcsey a supervisor, we did direct that the initial eight consecutive four hours of visitation, be conducted in her presence. We were mindful of the fact that Philip was familiar with Melanie, that her status as a stepmother in Philip's future would be important, and it was our way of easing Philip away from the paid supervisor into a family-style environment with his father. Melanie presented testimony before this court, and in the court's view, she was a compassionate and caring person who showed no bias one way or the other, and she could easily serve the purpose we intended of creating a comfort zone for Philip so as to facilitate the development of a relationship with his father.

Mother next asserts as error that the court denied her motion for reconsideration and did not grant a stay in the proceedings. For all of the above reasons, we believe that reconsideration and stay were not warranted and were contrary to the express intention of the decision of the court. Mother's request for stay, made to the Superior Court, was likewise denied.

In her last three complaints of error, Mother asserts that this court did not give proper weight to, nor consider, the criminal charges brought against Father for allegedly sexually abusing Matthew.

The court was provided with the transcript of the testimony of the preliminary hearing before the district magistrate (respondent exhibit no. 10), as well as conflicting evidence as to why the criminal charges were not pursued to conclusion. Based upon the evidence before the district magistrate, Father was held for court

on charges and a formal arraignment date was set. Thereafter, the charges were withdrawn by the Commonwealth at the time of trial in December 1995. There was conflict in the evidence as to what precipitated the withdrawal of the charges, but for the court's purposes, we were then left only with the fact that charges had been filed by Mother. This court gave ample consideration to this evidence as it was presented, and while Mother suggests in one of her complaints of error that the prosecutors dropped the charges to protect Matthew from the trauma of testifying at a criminal trial, there remains only the fact that the charges were dropped.

For the foregoing reasons, the order of court dated December 28, 1999, should be affirmed.